H. M. CARPENTER, Appellee, v. MODERN WOODMEN OF AMERICA, Appellant.

**Evidence:** DEPOSITIONS: SUPPRESSION: GROUNDS. A party is entitled to fully cross-examine a hostile witness. And where a witness, the custodian of defendant's records, documents and files, whose deposition was taken, evaded and refused to answer proper cross-interrogatories, his conduct was not only punishable for contempt, but the deposition was properly suppressed for that reason.

**Same.** Where a party had sufficient time after the suppression of a deposition to take the evidence again, and actually sued out a commission for that purpose, he could not complain of surprise or inability to obtain the evidence because of the suppression of the deposition.

**Insurance:** EVIDENCE OF DEATH: SUFFICIENCY. In this action upon a benefit certificate of life insurance, in which there was no direct evidence of death, the circumstantial evidence of insured's death is reviewed and held sufficient to support a finding of his death, and that it occurred about seven years prior to the assignment by the beneficiaries of their cause of action.

**Same:** DEATH: PRESUMPTIONS. A presumption of death arises from the unexplained absence of a party for the period of seven years, but there is no presumption as to the exact time during such period when the party died.

**Same:** ASSIGNMENT BY BENEFICIARIES: VALIDITY. Where the beneficiaries in a certificate of life insurance assigned their interests before they had become vested by the death of the insured, but testified as witnesses for the assignee in an action upon the certificate, the association could not question the validity of the assignments on the ground that they were prematurely made; as the beneficiaries would be estopped by their conduct from repudiating the transaction.

**Same:** PROOF OF LOSS: ESTOPPEL. Where an insurance association receipted for papers sent it as proofs of loss and asked for no further showing, it was estopped to thereafter question the sufficiency of the proofs furnished.

**Same:** ACTION UPON CERTIFICATE: DEFENSES. The failure of a board of directors of an insurance association to·act upon proofs of loss for nearly a year is in effect a denial of the claim, and under such circumstances the association cannot be heard to say that suit could not be maintained upon the certificate because instituted before the directors had passed upon the claim.

**Appeal:** ABSTRACT: TAXATION OF COSTS. Where the appellee filed an amended abstract, and everything material therein could have been presented in many less pages, the cost of the unnecessary pages are taxed to the appellee, although he was successful.

*Appeal from Jones District Court,* HON. MILO P. SMITH, Judge.

WEDNESDAY, JULY 2, 1913.

ACTION in equity upon a benefit certificate, issued by the defendant company, upon the life of William G. Wales. The beneficiaries named in the certificate were the wife and surviving children of the insured. Plaintiff bases his right to recover upon assignments of the certificate, made to him on January 9, 1911, by William D., Fred H., and Nellie M. Wales, and upon certain other assignments, one by Dan E. Wales to plaintiff, executed January 8, 1911, and another by Frances J. Wales, widow, to Fred H., Nellie May, William and Dan E. Wales, executed on November 10, 1910; the last-named assignees being all the children of the insured. Defendant filed answer containing many defenses, among others, that plaintiff had no right or authority to sue, that the insured was not dead, that no proofs of death were furnished, and that neither the insured nor his beneficiaries or their assignees had complied with the terms of defendant's certificate and by-laws. Upon the issues joined, the case was tried to the court, as in equity, resulting in a decree for plaintiff, and defendant appeals.—*Affirmed.*

*Truman Plantz* and *Geo. G. Perrin,* and *C. B. Paul,* for appellant.

*Herrick, Cash & Rhinehart,* and *J. W. Doxsee,* for appellee.

DEEMER, J.—Prior to the trial and on August 21, 1911, there was filed in the clerk's office of Jones county the deposition of one C. W. Hawes, the head clerk of the defendant, taken upon commission in the state of Illinois, for and on behalf of the defendant; and on August 29th of the same year plaintiff filed a motion to suppress this deposition, because the exhibits were not properly returned or identified, and for the further reason that the witness had contemptuously refused to answer the cross-interrogatories propounded to him, and had refused to produce certain papers, files, and documents in his possession, which were called for by the cross-interrogatories. Thereafter, and before the motion was heard, the commissioner taking the deposition filed an amendment to cure the alleged want of identification of exhibits, etc. Plaintiff then filed an amendment to his motion to suppress, and the whole matter was submitted to the court, resulting in an order sustaining the motion to suppress and striking the deposition from the files. Defendant then gave notice of suing out another commission, and plaintiff filed his cross-interrogatories; but, on direction of defendant's counsel, the commission was not sent to Illinois, and the second deposition was not taken.

The first question for our consideration is the correctness of the ruling sustaining the motion to suppress. If the ruling depended upon the identification of the documents therein referred to, and sent back with the deposition, we would be disposed to hold the order erroneous. But it does not rest on that ground alone. It is claimed that the witness used his own pleasure about answering certain of the cross-interrogatories, failed to produce certain documents called for, and artfully dodged, or attempted to dodge, the questions propounded to him. These charges seem to be sustained by the record. For example, we reproduce the following:

1. EVIDENCE: depositions: suppression: grounds.

Q. If, in answer to direct interrogatory 9 on behalf of the defendant, you produce and identify what purports to be the alleged by-laws of the Modern Woodmen of America, state which of said alleged by-laws, if any, were not in force at the time of the issuing of the certificate or policy of insurance by the defendant to William G. Wales, to wit, No. 37,061, dated the 13th day of March, 1894, for the sum of $3,000, being the certificate or policy of insurance involved in this action. A. The by-laws in force in 1894 have been revised and amended from time to time, and while the substance of the by-laws of 1894 are, for the most part, incorporated into the by-laws which I have marked 'Exhibit 1,' to be attached to this my deposition, the language has been changed in many respects, and some new provisions have been added.

Q. If, in answer to the last cross-interrogatory, you say that the alleged by-laws contain by-laws which you claim have been adopted since that date, then specify particularly the said by-laws, identifying them clearly, so that the court may know exactly what ones you claim have been adopted since the date of said policy, and give the date of the alleged adoption of each of said alleged by-laws. A. As above stated, the by-laws of Modern Woodmen of America have been changed from time to time in phraseology, and adopted as changed, although the substance of said by-laws has not been materially changed.

Q. Identify all of the alleged by-laws which you claim were in force at the time of the issuance of the certificate or policy of insurance to said William G. Wales hereinbefore mentioned. A. Practically all of these by-laws were in force at the time of the issuance of the certificate of insurance to William G. Wales.

Q. Is it not a fact that proofs of death of said William G. Wales were received by you from Herrick, Cash & Rhinehart, attorneys for plaintiff, by mail, on or about August 10, 1910, or what purported to be proof of loss in said matter? A. No; I never received any proofs of death of William G. Wales. I did receive from Herrick, Cash & Rhinehart some blanks, which at first I thought might be proofs of death, but upon examination, I found they were not.

Q. As secretary of the defendant, do you acknowledge receipt of proofs of loss or proofs of death, where claims are made against the company on certificates or policies of life insurance? A. Yes. . . .

Q. Is it not a fact that on August 12, 1910, you mailed to Herrick, Cash & Rhinehart, addressed to Monticello, Iowa, notice of having received death proofs 'in re claim of death of William G. Wales,' and is it not a fact that you mailed such notice at Rock Island, Ill., on said 12th day of August, 1910? A. I presume it is a fact, although I do not recall now the specific date when. The postal card, meaning to acknowledge the receipt of the papers sent, is mailed before the papers are examined. The papers, however, that were received concerning William G. Wales, of which you inquire, were not proofs of death of William G. Wales, but were statements of his disappearance.

Q. If in answer to cross-interrogatory 9 you say you did, on or about the 10th day of August, 1910, receive proof of death or loss in the matter of the claim of William G. Wales, state how the same was sent to you; that is to say, was it as ordinary mail matter, or was it by registered letter? Answer fully. A. I never received proofs of death of William G. Wales. The statements which I did receive concerned his disappearance, and it was by mail, I believe; but I cannot recall now whether it was by registered letter or not, for I do not keep any record of registered letters.

Q. If in answer to any of the foregoing cross-interrogatories you say you did receive proof of death or loss in re claim of William G. Wales, then produce the same, and identify the same, and have the notary taking your deposition attach it as a part of your deposition and your answer to this interrogatory. A. No proofs of death of William G. Wales were ever received by me.

Q. State whether or not, since receiving proof of loss or death in the matter of the claim of said William G. Wales, if you say you did receive such document, you have at any time called upon plaintiff or the claimants, to wit, the beneficiaries named in said policy, or any one representing them, for any additional or further proofs of death or loss, and, if so, whom? A. I do not believe I ever called upon any one for any proofs in this matter.

I.    These are simply samples of the questions asked and the manner of the answers given; and as the witness had testified in chief that he was the custodian of all the records, documents, and files of the association, and that no proofs of death of Wales had ever been filed, and that the board of directors of his corporation had never passed upon the same, or of the claimant's rights to benefits, the matter called for was proper cross-examination, and the witness should have answered the questions and produced the papers or documents called for, or duly attested copies thereof.    This he did not do, and in consequence, had his deposition been offered and read, plaintiff would have been denied the benefit of cross-examination.    One is entitled to fully cross-examine a hostile witness, and the courts will not tolerate any practice which deprives him of that right.    To refuse to answer proper cross-interrogatories is not only a contempt of court, for which a witness may be punished, but when the testimony is taken by deposition, it is a ground for suppressing the deposition, even though the statute does not so provide in express terms.    Our Code (sections 4712 and 4713) recognizes the right to suppress depositions, but does not state the grounds therefor, save that it must be for some other cause than incompetency, irrelevancy, or immateriality.    The grounds here are failure of the witness to respond to the cross-interrogatories.    This, we think, was sufficient, and was fully established.    The question has never before arisen in this state; but courts of other jurisdictions have unanimously held this good ground for suppressing depositions.    See *Robinson v. Railroad Co.*, 7 Allen (Mass.) 393; *Electric Co. v. Rust*, 131 Ala. 484 (31 South. 486); *Morris v. Shoe Co.*, 44 Tex. Civ. App. 488 (99 S. W. 178); *Calhoun v. Trust Co.*, 124 App. Div. 633 (109 N. Y. Supp. 77); *Bowen v. Electric Co.*, 146 App. Div. 672, (131 N. Y. Supp. 536); *Missouri Co. v. Davis*, 53 Tex. Civ. App. 547 (116 S. W. 423).

Defendant had ample time to take a new deposition be-

fore the trial commenced, and it went so far as to sue out a
commission. For some reason it did not fur-
ther pursue it efforts, and it has no cause for
complaint on the ground of surprise or inability to obtain its
testimony.

2. SAME.

II. No one has seen the dead body of the insured; but
his demise is attempted to be shown by circumstances, and
the proofs of death were of the same character. The certificate
of insurance was issued on the 13th day of
March, 1894; the insured being at that time a
resident of Monticello, Iowa. He lived at
that place continuously from that time down until the sum-
mer of the year 1898, when he went to the state of Wash-
ington, and there worked in lumber camps, and received
mail or established himself at New Whatcom, Geneva, and
Seattle, respectively, and temporarily, perhaps, at some other
places or camps. After leaving Iowa, he kept up corres-
pondence with some of the members of his family, writing
one or the other of them practically every month, until some
time in the fall of the year 1902. His relations, especially
with two of his children, were friendly and amicable, and
he seemed to have an interest in their success, and planned
for some of them to join him in Washington, believing that
one, a daughter, might be able to teach school there. He
went to Washington to look at the country, intending to
stay if he liked it, but, if not, to return to Jones county.
Prior to the year 1902, the longest interval between his
letters was three months. After the fall of 1902, nothing
was heard from him directly. It appears that one Marvin,
who lived in Seattle, during the years 1902, 1903, and 1904,
and for whom Wales at one time worked here in Iowa, saw
him (Wales) in the early part of the year 1903 or 1904, the
exact year being a question in some doubt, and this witness
gave substantially the following testimony:

3. INSURANCE:
evidence of
death: suf-
ficiency.

. . . I lived in Seattle, Wash., from August, 1897, until
February, 1908. I first saw William G. Wales in the city of

Seattle in the autumn of 1898.   He remained at or near there all the time until some time in 1904, when he went to Los Angeles, Cal., for his health, as he had contracted a very bad cold; he had an attack of pneumonia, and was afflicted with a very bad cough.   I last saw William G. Wales early in the year 1904.   His health, at the time of my last meeting with him, was very bad, so much so that I did not consider him in fit condition to be around at all, and I wished to take him to a hospital, as I felt confident he could survive but a day or two.   I found, upon examination, that he had a very weak pulse; he seemed to be afflicted with quick consumption, which was apparently far advanced.   I tried to give him some whisky to revive him, but he would not take it, but did take a dose of aromatic ammonia, and then rested upon a couch in my private office for a time.   I gave him some letters from his family, and he was visibly affected, and fainted for a few minutes, he was so weak.   He spoke of having good health in Washington up to the time of his taking cold. After taking the ammonia he felt some better, and said he would go to the drug store and get some medicine for which his doctor had given him a prescription.   After the time spoken of, I never saw him again.   I saw him often in Seattle, and one special visit he came to my home, and stayed for a day or two.   This was less than a year before the sickness of which I spoke.   He was feeling well at that time, and was well dressed.   .   .   .   He was working not far away, at or near Geneva, in Skagit county.   He talked with me about his family many times, and he seemed glad to have me read from my letters from my sister Mary of the progress of his children, who were in the school where she was teaching.   These talks were frequent and never did he once speak unkindly of any member of his family, but blamed all the trouble on his relative by marriage, Horace Downer.   The last time I saw William G. Wales in Seattle his physical condition was very bad. .   .   .   I spent much time, and was often at quite an expense to try to learn something more of him, but I never succeeded in the effort.   I visited the police department, and the hospitals, and wrote many people who might have seen him, but I could not learn anything of him after I parted with him, as stated above.

Q.   State what your opinion is as to whether William G. Wales is alive or dead, and state the reasons for your opinion, if you have any, concerning it.   A. I believe he must

have died shortly after I last saw him. I have seen many people afflicted as he was, and never knew one afflicted as badly as he was to live long. There seemed to be a complete breaking down of the lung tissues, from what I could learn, and his condition was so low that he did not respond much to stimulants. He presented the aspect of one thoroughly broken down. William G. Wales' relatives frequently sent me letters for delivery to him. This occurred very often for four or five years. I knew William G. Wales in Seattle, from 1898 until early in 1904. In Seattle I would see William G. Wales, sometimes every day for a week or more, and sometimes only for a few minutes. During that period of time, he would, at intervals, absent himself from the city and from me, and would be gone three or four months; but he left his address at Geneva, Wash., excepting when he went to California, and on that occasion he directed me to hold his mail until he returned. . . . I was often requested by relatives of William G. Wales, from the time I saw him early in 1904, to make search for him, and the request was by letters, but I didn't keep them. I never saw the dead body of William G. Wales. I have never found any public record showing the death of William G. Wales, and no one ever told me of having seen William G. Wales' dead body.

After Wales dropped out of sight, some of his relatives went to Seattle and other places and tried to locate him, and advertisements were inserted in the leading papers in the hope of discovering his whereabouts, all without avail. No one went to California, however, and there is some question upon the record as to whether Wales went to California after he was last seen alive by the witness from whose testimony we have quoted. There are many things to indicate that this witness was mistaken in the date given by him; that it was in 1903, instead of 1904, when he last saw him; but, however this may be, the testimony, as we think, shows that the insured made his California trip before he was last seen in Seattle, and that when last seen there he was not then contemplating a trip to California. The testimony is ample, we think, to show the death of Wales by presumption alone, arising from his absence for more than seven years,

without being seen or heard from by those to whom he would most likely make himself known, and with whom he would come in touch.

This action was commenced on June 25, 1911, and proofs of death were made on August 10, 1910. We have already given the dates of the assignments. If the case depended

4. SAME: death: presumptions. upon the absence of Wales alone, or if there were any presumption that his death occurred on the last day of the seven years of absence unheard of, there would be much ground for holding that the action was prematurely brought. But neither proposition is true. Plaintiff is relying upon something more than the presumption arising from absence for the seven-year period, and the law makes no presumption as to what exact time during that seven-year period the death occurred. *Tisdale v. Insurance Co.*, 26 Iowa, 170; *Seeds v. Grand Lodge*, 93 Iowa, 175; *Leach v. Hall*, 95 Iowa, 611; *Sherod v. Ewell*, 104 Iowa, 253; *Magness v. M. W. A.*, 146 Iowa, 1; *State v. Henke*, 58 Iowa, 457. There was enough testimony to justify the trial court in finding that Wales is dead, and that he died some time in the summer of the year 1903. That being true, most of the troublesome questions suggested by appellant's counsel vanish.

III. For instance, it is said that plaintiff has not capacity to sue; that his assignments were made before the death of the insured, when the beneficiaries, the assignees, had no

5. SAME: assignment by beneficiaries: validity. vested interest. The first of these assignments was made in November of the year 1910, after the seven years had elapsed, and after the beneficiaries had a vested interest in the certificate. Aside from this, however, all persons interested in the policy, either as named beneficiaries or as heirs of Wales, have assigned their interest to plaintiff. Conceding that this was done before their interests vested, nevertheless they have not repudiated their assignments. On the contrary, they each and all gave testimony on the trial of this case, and each knew that plaintiff was claiming as their assignee under the assign-

ments. In such circumstances, they would be estopped from
thereafter making any claim against the defendant, no matter
whether the interests acquired after the assignments inured
to the plaintiff or not. *Brown v. Life Ass'n,* 172 Mass. 498
(53 N. E. 129) ; *Jarvis v. Binkley,* 206 Ill. 541 (69 N. E. 582) ;
*Gere v. Insurance Co.,* 67 Iowa 272. There is no merit in the
contention that plaintiff had no right to sue.

IV. Sufficient proofs of loss were furnished the defend-
**6. Same: proof** ant. But, if this be not true, defendant is
**of loss: es-**
**toppel.** estopped from denying that fact. It receipted
for the papers sent as proofs of loss, and never called for
any further showing.

V. The effect of a supposed by-law, providing in effect
that the presumption of death should not arise until the
insured had arrived at his full expectancy of age, need not
be considered, because no proper proof of such a by-law is
in the case. If it were, it is not shown when the same was
adopted, and there is some doubt of the right of the com-
pany to change the rule as to presumption of death by a
by-law enacted after the certificate is issued. Upon that
proposition we express no opinion, and what we have said
should not be considered as a holding either way upon that
proposition. Aside from this the trial court might well have
found from the testimony that the insured in fact died some
time in the year 1903. It did find as a fact that the death
occurred June 30, 1903. This finding has support, and dis-
poses of most of the claims made for appellant.

VI. Defendant's board of directors had ample time
before the bringing of this suit to pass upon the proofs of
death furnished by the plaintiff, and will not be heard to
                          say that plaintiff cannot sue because its board
**7. Same: action** of directors has not passed upon the claim.
**upon certifi-**
**cate: defenses.** Inaction on its part is the equivalent of a
denial of the claim, and the action or non-action of the defend-
ant's board will not deprive the courts of their jurisdiction.

VII.   We agree with appellant upon many of the legal propositions advanced; but, with the deposition of the witness Hawes out of the case, most of these are inapplicable and of no controlling importance.

8.  APPEAL: abstract: taxation of costs.

Appellee has filed amendments to the abstract, consisting of thirty-eight pages. Everything material or important therein could have been presented in ten pages. Appellant asks us to tax the cost of the additional pages to appellee, and we think the motion should be sustained. Appellee will pay the costs of printing twenty-eight pages of his amended abstract, but otherwise all the costs of this appeal will be taxed to appellant.

Finding no error, the decree must be, and it is, *Affirmed*.